# UNITED STATES DISTRICT COURT
## District Of Massachusetts

SYED K. RAFI, PH.D.  )
*Plaintiff*  )
 )
*v.*  )        Civil Action No.: _____
 )
Cynthia C. Morton, PH.D.  )
*Defendant*  )
    <u>*In Personal Capacity*</u>  )
    *&*  )
    <u>*In Professional Capacity*</u>  )

## <u>COMPLAINT</u>

1    The plaintiff, Dr. Syed Rafi, moves the Court for entry of judgment in his favor against

2    defendant, Dr. Cynthia C. Morton, and in support of such Complaint avers as follows:

3    ### <u>NATURE OF ACTION</u>

4    Defendant, Dr. Cynthia C. Morton, Director of Clinical Cytogenetics Laboratories and

5    Professor of Pathology at Brigham and Women's Hospital (BWH), Harvard Medical School

6    (HMS)  is being alleged in this complaint as having  conspired "<u>in her personal capacity</u> as well

7    as <u>in her professional capacity</u>" with Dr. Richard P. Lifton, Chairman of Genetics Department at

8    Yale School of Medicine (YSM) ever since plaintiff, Dr. Rafi completed his postdoctoral-

9    American Board of Medical Genetics (ABMG)- professional clinical cytogenetics training at Dr.

10    Lifton's Genetics Department (YSM) during 2003-04 period, <u>to deny</u> any consideration of

11    plaintiff's more than three dozen professional clinical cytogenetics diagnostic laboratory position

1  applications as well as more than a dozen medical genetics research position applications over

2  these years not only at her diagnostic and research laboratories, but also actively prevented

3  plaintiff from being hired at other medical genetics research laboratories at Harvard Medical

4  School as a whole. She is also accused of adamantly refusing to release federal government-

5  research grant money that belonged to her research collaborator, Dr. Richard Maas at Brigham

6  and Women's Hospital (BWH/HMS) knowing that Dr. Maas was planning to hire Dr. Rafi

7  (plaintiff) at his medical genetics research laboratory at BWH utilizing his share of those federal

8  research funds, as the email(s) evidence affirms.

9      Dr. Lifton in order to safeguard against a potential racial discrimination, retaliation, and

10  constitutional violation- law suit by a disgruntled *Arab-Palestinian of minority-race* faculty

11  member, namely, Dr. Mazin Qumsiyeh (*whose faculty position was abruptly terminated by Dr.*

12  *Lifton / YSM*), Dr. Lifton planned to utilize plaintiff as a befitting *minority- race and non-white-*

13  witness against Dr. Qumsiyeh in order to facilitate the rehiring of Dr. Barbara Pober (*of*

14  *majority-race and Jewish*), while denying Dr. Qumsiyeh a *prima facie* case of retaliation, racial

15  discrimination, and violation of his Constitutional rights for the abrupt termination of his faculty

16  position by Dr. Lifton / YSM, by the simultaneous termination of Dr. Pober's faculty position at

17  YSM, but allegedly promising her that she would be re-hired after sometime along with plaintiff,

18  Dr. Rafi, since Dr. Pober and Dr. Rafi were clinical cytogeneticists, and therefore could take over

19  the clinical cytogenetics operation at Dr. Lifton's Genetics Department at YSM due to Dr.

20  Qumsiyeh's job termination by Dr. Lifton.

21      Therefore, the alleged conspiratorial plan was in fact designed to facilitate the re-hiring of

22  a third party, Dr. Barbara Pober at YSM by Dr. Lifton. Defendant, Dr. Morton ceaselessly

23  coerced Dr. Rafi (plaintiff) to take up a position at Dr. Lifton's Genetics Department instead (by

1  denying consideration of his multitudes of job opportunities at HMS) in order to facilitate the re-

2  hiring Dr. Barbara Pober by Dr. Lifton at YSM.

3       This *race-based legal maneuvering* by Dr. Lifton / YSM and the ensuing conspiratorial

4  collusion with Dr. Morton at HMS in-turn caused defendant, Dr. Morton to illegally perpetuate

5  reckless and ceaseless intentional retaliatory discrimination against plaintiff, Dr. Rafi's dozens of

6  professional clinical cytogenetics job applications at defendant, Dr. Morton's ever-expanding

7  professional clinical cytogenetics laboratory at BWH and at HMS as a whole, and around the

8  nation, *as a domino effect*- to this day, <u>in reckless violation of plaintiff's Civil Rights and</u>

9  <u>Constitutional Rights, as a US citizen.</u>

10       Defendant, Dr. Morton ceaselessly executed the alleged conspiratorial intentional job

11  discriminations as an active and willing participant in the alleged conspiracy, given that Dr.

12  Lifton was defendant's former medical genetics colleague at BWH, prior to his assuming the

13  Chairmanship of the Genetics Department at YSM, and they both belong to the majority White-

14  Caucasian- race and majority Christian faith, and both are leading but inter-dependent

15  researchers in the field of medical genetics.

16       Plaintiff, Dr. Rafi brings this suit against defendant, Dr. Morton "<u>in her personal capacity</u>

17  <u>as well as in her professional capacity</u>" under the following applicable Civil Codes and Statutes.

18  In addition, "<u>defendant, Dr. Morton also knowingly neglected and refused to prevent the</u>

19  <u>conspiracy to interfere with plaintiff's Civil rights and Constitutional rights</u>".

20       Therefore, plaintiff brings this suit against defendant, Dr. Morton "<u>in her personal</u>

21  <u>capacity and professional capacity</u>", **under the Continuing Violations Doctrine / Continuing**

22  **Claims Doctrine** (See: *Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Pegram v.*

1   *Honeywell, Inc., 361 F.3d 272, 279 (5th Cir. 2004)),* and under the following applicable US Civil

2   Codes and Statute:

3

4   **I.**    **42 U.S.C. § 1985(3)** - *Conspiracy to Interfere With Civil Rights and*
5                          *Constitutional Rights;*
6

7   **II.**   **42 U.S.C § 1986** - *Unlawful To Neglect or Refuse to Prevent Conspiracy to*
8                          *Interfere With Civil Rights and Constitutional Rights;*

9   **III.**  **42 U.S.C. § 1981a**- *Damages in cases of intentional discrimination in*
10                         *employment;*

11  **IV.**   **42 U.S.C. § 2000d -4a: Title VI** *of the Civil Rights Act of 1964, <u>As Amended</u>;*

12  **V.**    **Spending Clause 1** *(Article I, Section 8) of the U.S. Constitution*; and

13  **VI.**   **42 U.S.C. § 1983**- *Civil action for deprivation of rights.*

14

15

16                          **<u>PARTIES</u>**

17      **Plaintiff, Dr. Syed Rafi** is a naturalized United States citizen during the alleged

18  continuing violations period in this complaint, Male, Asian of East Indian heritage, and of

19  Islamic / Muslim faith.  Plaintiff currently resides in <u>Falls Church,  VA 22044.</u>

20

21      **Defendant, Dr. Cynthia Morton** is a United States citizen and permanent resident of

22  Boston, MA. Her officially known address in Boston, MA is at Brigham and Women's Hospital

23  (75 Francis Street, Boston MA 02115), where she serves as the Director of Clinical Cytogenetics

24  laboratories and professor of pathology.

25

26

27

4

1        **JURISDICTION**

2        This litigation is between citizens of different States [Falls Church, Virginia (*plaintiff*)

3   and Boston, Massachusetts (*defendant*)], wherein, pursuant to U.S. Code, Title 28, part IV,

4   chapter 85, Code § 1391-(1): *A civil action may be brought in a judicial district _in which any_*

5   *_defendant resides_, if all defendants are residents of the State in which the district is located.*

6   Accordingly, this United States judicial district has jurisdiction over this subject matter.

7        Pursuant to 28 U.S. Code § 1332 - Diversity of citizenship; amount in controversy; costs:

8   *the District Courts shall have original jurisdiction of all civil actions where the matter in*

9   *controversy exceeds the sum or value of $75,000, exclusive of interest and costs:* as determined

10  in this case to secure equitable or other relief given the extent of the alleged continuing coercive

11  retaliatory violations and intentional discrimination consequent to the alleged conspiracies by

12  defendant, his failing to prevent or to aid in preventing the alleged wrongs, and the consequent

13  deprivation of Constitutional and Civil rights.

14       Since this complaint, under the Continuing Violations Doctrine, alleges violations of the

15  following U.S. Code of laws and Article of the Constitution: 42 U.S.C. §1985(3), §1986, §1981,

16  § 1983, § 2000d-4a, and the Spending Clause 1 (*Article I, Section 8*) of the U.S. Constitution,

17  this U.S. District Court's jurisdiction is also invoked pursuant to 28 U.S.C.A. § 1331 (1948) &

18  28 U.S.C.A. § 1343 (1948):

19       In accordance with 28 U.S.C. § 1331: *The district courts shall have original jurisdiction*
20       *of all civil actions arising under the Constitution, laws, or treaties of the United*
21       *States.*
22       In accordance with 28 U.S.C. § 1343: *The district courts shall have original jurisdiction*
23       *of any civil action authorized by law to be commenced by any person:*

1          *To recover damages for injury to his person or property, or because of*
2    *the deprivation of any right or privilege of a citizen of the United States, by any*
3    *act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;*
4          *To recover damages from any person who fails to prevent or to aid in*
5    *preventing any wrongs mentioned in section 1985 of Title 42 which he had*
6    *knowledge were about to occur and power to prevent;*
7          *To redress the deprivation, under color of any State law, statute,*
8    *ordinance, regulation, custom or usage, of any right, privilege or immunity*
9    *secured by the Constitution of the United States or by any Act of Congress*
10   *providing for equal rights of citizens or of all persons within the jurisdiction of*
11   *the United States;*
12         *To recover damages or to secure equitable or other relief under any Act*
13   *of Congress providing for the protection of civil rights……*
14
15
16   ## **RELATED ACTION**

17   This complaint against defendant, Dr. Morton, "*in her personal capacity as well as*

18   *professional capacity*" is related to plaintiff's initial Civil Action (#14-cv-14017-GAO) at the U.S.

19   District Court for the Massachusetts District that was filed against the following institutions:

20   Brigham and Women's Hospital, Children's Hospital Boston, Massachusetts General Hospital,

21   Harvard Medical School, and Harvard University.

22       **This Continuing Violations complaint specifically against Dr. Cynthia Morton, in**

23   **her personal as well as professional capacities, is being brought *under the following***

24   ***different sets of applicable Civil Codes and Statute:***

25   - ***Conspiracy to Interfere With Civil Rights and Constitutional Rights,*** under

26   **42 U.S.C. § 1985(3);**

27   - ***Unlawful To Neglect or Refuse to Prevent Conspiracy To Interfere With***

28   ***Civil Rights and Constitutional Rights,*** under

29   **42 U.S.C § 1986;**

30   - ***Damages in cases of intentional discrimination in employment,*** under

31   **42 U.S.C. § 1981a;**

1  • ***Title VI of the Civil Rights Act of 1964, <u>As Amended</u>:*** under
2     <u>42 U.S.C. § 2000d -4a</u>;
3  • ***Article I, Section 8 of the U.S. Constitution,*** under
4     <u>Spending Clause 1</u>; and
5  • ***Civil action for deprivation of rights,*** under
6     <u>42 U.S.C. § 1983</u>.

7                          <u>**CAUSES OF ACTION**</u>

8
9   I.   <u>PLAINTIFF INVOKES THE *CONTINUING VIOLATION DOCTRINE / CONTINUING*
10       *CLAIMS DOCTRINE* IN HIS ALLEGATIONS OF PROLONGED CEASELESS AND
11       RECKLESS INTENTIONAL RETALIATORY AND DISCRIMINATORY
12       VIOLATIONS:</u>
13
14            *EMANATING FROM THE SAME CONSPIRATORIAL AND RETALIATORY*
15            *FACTOR, SINCE 2004 TO PRESENT, AS A DOMINO EFFECT*
16
17       Plaintiff, Dr. Rafi, in this "personal as well as professional capacities"- case argues that

18   his job opportunities were ceaselessly intentionally retaliated against due to the alleged illegal

19   conspiracy, and this violated plaintiff's Civil Rights and Constitutional Rights as a US citizen,

20   since 2004 to this day- <u>as a domino effect</u>, which is attributable to the same conspiratorial

21   collusion between defendant, Dr. Morton and Dr. Lifton as well as Dr. Pober- which is in

22   accordance with the Continuing Violations Doctrine as defined by the U.S. Supreme Court in

23   *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002*).*  United States Supreme

24   Court <u>does recognize systemic violations</u>, which involve the continuing policy or practice of

25   discrimination- which policy or practice continues into the statutory period, as has been alleged

26   in this complaint.

27        (See, **"The Continuing Violations Doctrine"***,* Kyle Graham, and 43 Gonz. L. Rev. 271
28            (2008);
29        http://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1024&context=facpubs).
30
31

                                          7

II.    <u>**CAUSE OF ACTION UNDER 42 U.S.C. § 1985(3):**</u>

>    *CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS AND CONSTITUTIONAL RIGHTS*

<u>In this civil action, under **42 U.S.C. § 1985(3)** plaintiff alleges class and race- based conspiracy that ceaselessly deprived plaintiff of his civil rights, equal protection, privileges, and immunities for a prolonged period of time.</u>

*Conspiratorial acts involving powerful groups of individuals* (viz. defendant, Dr. Morton conspiring and colluding with Dr. Lifton as well as Dr. Pober in this case) *potentially invade a citizen's constitutional rights in a far more serious way than direct action by government to infringe those rights* [See, *First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978)].

<u>In 1866 and 1871, United States Congress passed a series of civil rights laws to implement the Thirteenth, Fourteenth, and Fifteenth Amendments.</u>  Among them, **Title 42 of the US Code § 1985 is directed at conspiracies of two or more persons:**

>    *"If one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, <u>the party so injured or deprived may have an action for the recovery of damages occasioned by such injury of deprivation, against any one or more of the conspirators."</u>*

**Title 42 of the US Code § 1985-** contains <u>no</u> "under the color of the law <u>or</u> federal law"- requirements akin to that of **§ 1983.**

1     A cursory look at plaintiff's career information indicates <u>an abrupt and permanent end to</u>

2     <u>his high paying professional clinical cytogenetics career</u> since his successful completion of his

3     professional board training at Dr. Lifton's Genetics Department at Yale School of Medicine

4     during 2004, instead of blossoming, <u>despite the fact that plaintiff has had nearly a decade of</u>

5     <u>successful professional clinical cytogenetics career</u> (*Exhibits # 1 & 2*) <u>*prior to*</u> *his completion of*

6     *the professional training (American Board of Medical Genetics: ABMG / ABMGG)- in clinical*

7     *cytogenetics during 2001-03 period at YSM,* as listed below**:**

8     (1) Maryland State licensed Director of Clinical Cytogenetics laboratory (1992-93);

9     (2) Associate Director of Clinical Cytogenetics at the Armed Forces Institute of Pathology

10    (AFIP), Walter Reed Army Medical Center (*WRAMC; US-Dept. of Defense*), Washington,

11    DC (1990-92);

12    (3) Senior Clinical Cytogeneticist at the Laboratory Corporation of America, Raleigh, NC (1998-

13    99);

14    (4) Research Clinical Cytogeneticist at Duke University Medical Center, Durham, NC(1989-00);

15    and

16    (5) New York State-Clinical Cytogenetic Laboratory- supervisor certification (1988),

17    <u>as documented in-detail below:</u>

- Clinical Cytogenetics- ABMG- Trainee, and Cytogenetic Technologist, Department of Genetics, Yale University School of Medicine, New Haven, CT. Jan. 2001- Dec. 2003.

   *<u>Employer</u>*: Yale University School of Medicine; 333 Cedar Street, New Haven, CT 06510

   *<u>Ending job title</u>*: Medical Genetics / Cytogenetics Fellow

   Responsibilities & Publications:

   Clinical cytogenetics diagnostic responsibility included bone marrow and solid tumor cytogenetics, as well as undergoing ABMG medical genetic trainings.

   This diagnostic medical genetic training should also serve me well in professionally executing the duties of this clinical genomic diagnostic test development!!!

   During this medical genetics training at Yale, the following clinical molecular cytogenetic publications were accomplished:

   ETV/CBFA2 Fusions in Childhood B-Cell Precursor Acute Lymphoblastic Leukemia with Myeloid Markers. <u>Syed K. Rafi</u>, Howeida Elgebaly, and Mazin B .Qumsiyeh. *Diagnostic Molecular Pathology 9(4): 184-189, 2000.*

9

Double Supernumerary Isodicentric Chromosomes derived from 15 resulting in Partial Hexasomy.
Mazin Qumsiyeh, Syed Rafi, Catherine Sarri, Maria Grigoriadou, Jolanda Gyftodimou, Effie Pandelia, Hara Laskari, Michael B. Petersen.
*American Journal of Medical Genetics 116A (4): 356-359, 2003;*

- Visiting Scientist, Genome Center, North Carolina State University, Raleigh, NC. Jan, 2000- 02;

- Associate Research Cytogeneticist, Duke University Medical Center, Durham, NC. 1999- 00;

- Senior Clinical Cytogeneticist, Lab. Corp. of America, Research Triangle Park, NC. 1998- 99.

- Visiting Scientist, Armed Forces Institute of Pathology, Walter Reed Army Medical Center, Washington DC. 1993-95.

    Responsibilities & Publications:

    Served as Principal Investigator for the Department of Defense funded genetic research project to study the effect of hyperoxia and caffeine on the expression of Fragile-X (q27.3) that resulted in the following publication:

    > Effects of hyperoxia and caffeine on the expression of fragile site at Xq27.3.
    > S.K.Rafi, R,B.Surana, L.H.Anderson. K.L.Christopher. B.Wilson and W.J.Mehm.
    > *American Journal of Medical Genetics 1996: 61:4 : 299-303.*

- Director, Clinical Diagnostic Cytogenetics Laboratory, Providence Lab. Associates, Rockville, MD. 1992- 94.

    *Established A Brand New CLIA- Certified & State Of Maryland Certified Clinical Cytogenetics Laboratory, And I Was Issued State Of Maryland's Director Of Clinical Cytogenetics Laboratory License To Operate the Laboratory.*

- Associate Director, Clinical Cytogenetics Division, Armed Forces Institute of Pathology, Walter Reed Army Medical Center, Washington, DC. 1990-92.

    Responsibilities & Publications:

    **Cancer and Leukemia-Group-B (CALGB)- NCI- Institutional Cytogeneticist at the Armed Forces Institute of Pathology, Walter Reed Army Medical Center, Washington, DC.**

    **Directed the cytogenetic training course; Secured a Department of Defense research grant to conduct genetic studies to study the effect of hypoxia; and the findings were published later:**

    Effects of hyperoxia and caffeine on the expression of fragile site at Xq27.3.
    S.K.Rafi, R,B.Surana, L.H.Anderson. K.L.Christopher. B.Wilson and W.J.Mehm.
    *American Journal of Medical Genetics 1996: 61:4 : 299-30.*

    Constitutional heteromorphism of 9q 13-q21 in a patient with chronic myelogeneous leukemia. R.B.Surana, S.K.Rafi. K.L.Christopher, T.J.Reid and R. B. Weiss.
    *Clinical Genetics 1995:47(6):320-322.*

- New York State-Clinical Cytogenetic Laboratory- supervisor certification (1988),

10

1    Plaintiff, Dr. Rafi successfully  completed his ABMG- required professional clinical

2   cytogenetics training at YSM at Dr. Lifton's Genetics Department during 2001-03 period well

3   beyond the required time period, but Dr. Qumsiyeh, as director of the diagnostic cytogenetics

4   laboratory under the chairmanship of Dr. Lifton, continued the exploitation of plaintiff's talents

5   and time (without pay) well beyond the ABMG-board required training time period (18 months,

6   instead of the required 12 months of training period), to compensate for Dr. Qumsiyeh's lack of

7   attention to the diagnostic cytogenetics laboratory's operation as its director, <u>given Dr.</u>

8   <u>Qumsiyeh's highly involved local and international pro-Palestinian and anti-Israeli political</u>

9   <u>activism often from YSM academic office at the laboratory, **as has been only partially**</u>

10  **<u>documented below:</u>**

11    http://archive.adl.org/israel/qumsiyeh/default.html#.VoLdT_krLak

12    http://archive.adl.org/campus/campus_incidents.html

13    http://archive.adl.org/israel/qumsiyeh/#.VoLe7vkrLak

14    http://www.salem-news.com/articles/march012010/mazin-folo-mg.php

15    http://www.countercurrents.org/qumsiyeh030310.htm

16    salem-news.com/articles/june092010/**mazin-arrest**-tk.php\

17    **Jun 08, 2010** · We are alarmed and concerned in reporting that **Dr. Mazin Qumsiyeh** PhD, has
18    been **arrested** by border police while involved in a nonviolent political direct ...

19    Israeli Soldiers **Arrest Dr**. **Mazin Qumsiyeh** for...
20    salem-news.com/articles/november132011/**mazin-arrest**.php
21    **Nov 12, 2011** · ... Salem-News.com writer **Dr. Mazin Qumsiyeh** was **arrested** in Al-Walaja this
22    morning ... Jun-09-2010 Salem-News.com Writer **Arrested** After **Protest** Near ...
23
24    **Dr. Mazin Qumsiyeh** describes his attack and **arrest** on Nakba ...
25    electronicintifada.net/blogs/nora-barrows...
26    You are here **Dr. Mazin Qumsiyeh** describes his attack and **arrest** on Nakba day
27
28    **Dr. Mazin Qumsiyeh** Faces **Arrest** By IDF -...
29    www.wrmea.org/action-alert-archives/**dr.-mazin-qumsiyeh**...
30    **Dr. Mazin Qumsiyeh** Faces **Arrest** By IDF. Israel has cracked down hard on nonviolent
31    resistance arresting dozens of activists in Bi'lin, Ni'lin, Al-Masara, and
32
33    **Mazin Qumsiyeh** | The Electronic Intifada

1    electronicintifada.net/tags/**mazin-qumsiyeh**
2    Several activists were **arrested** by Israeli ... How two 69-year-old women challenged Israel's
3    restrictions on Welcome to Palestine **protest**. ... **Dr. Mazin Qumsiyeh**, ...
4
5    Keep **Mazin Qumsiyeh** Free & Organize to Challenge...
6    www.endtheoccupation.org/article.php?id=2568
7    **Dr**. **Mazin Qumsiyeh**, ... **Qumsiyeh** and all other Palestinian nonviolent activists who are
8    being **arrested** ... Israel responds to Palestinian nonviolent **protest**, ...
9
10    Tim King : Is Israel Waging a Military Assault on...
11    mycatbirdseat.com/2011/05/tim-king-is-israel-waging-a...
12    ... where **Dr**. **Qumsiyeh** was **arrested**. ... More on **Dr. Mazin Qumsiyeh**. ... Tim King : Is Israel
13    Waging a Military Assault on Intellectuals?
14
15    **MAZIN QUMSIYEH**: Israeli army wants me - Intifada Palestine
16    www.intifada-palestine.com/2010/03/**mazin-qumsiyeh**...
17    Israeli repression in Palestine is escalating The Israeli army
18    invaded **Mazin Qumsiyeh** ... **Dr**.**Qumsiyeh's** ... , **Mazin Qumsiyeh**, nonviolent **protest**,
19
20    Three Activists Detained in Nonviolent Action Near...
21    www.imemc.org/article/58888
22    Israeli forces **arrested** two Israeli activists, and **Dr. Mazin** ... **Dr. Qumsiyeh** said, noting that
23    the **protest** was peaceful and ... Several **Arrested** in Connection ...
24
25    Persecuting **Mazin Qumsiyeh** | SocialistWorker.org
26    socialistworker.org/2010/03/19/persecuting-**mazin-qumsiyeh**
27    **Dr**. **Mazin Qumsiyeh** is wanted by the Israeli government for the "crime" of organizing ...
28    Persecuting **Mazin Qumsiyeh**. ... he was not immediately **arrested**.
29
30    Israeli Terror At Rights Activists House By **Mazin** ...
31    www.countercurrents.org/**qumsiyeh**030310.htm
32    By **Mazin Qumsiyeh**, PhD. ... a wanted man now for engaging in nonviolent **protest**! ... many
33    examples of people who also did not do any violence and were **arrested**, ...
34
35    **Mazin Qumsiyeh** Palestine Today and in the Future - YouTube
36    www.youtube.com/watch?v=izZVJSY1E48
37    Video oD Talk by **Dr. Mazin Qumsiyeh** of Bethlehem University Monday, April 7, 2014 @ SFU
38    Harbour Centre, Vancouver, Canada. **Dr. Qumsiyeh** talked about the ...)
39

40    Therefore, Dr. Lifton, being the Chairman of the Genetics Department, along with YSM

41    authorities very diligently and stealthily planned to terminate Dr. Qumsiyeh's associate professor

42    of genetics and director of clinical cytogenetics laboratory positions, and allegedly decided to

43    utilize Plaintiff, Dr. Rafi as a befitting and minority counter witness against Dr. Qumsiyeh,

44    despite the fact that plaintiff  has had refused to be utilized as a witness against Dr. Qumsiyeh,

1    per his written request that was submitted to Dr. Lifton (Exhibit # 3) at the completion of his

2    professional clinical cytogenetics training at YSM during 2004.

3         However, given the certainty that  any racial discrimination case against Dr. Lifton and

4    YSM by Dr. Qumsiyeh (*who is a non-While race and Middle Eastern- Arab minority, but with*

5    *huge popularity and following among the Middle Eastern Arabs at Yale University as a whole*

6    *(in fact, around the world as well) and with political ties to US politicians as well),* or even a

7    demonstration by him along with his Middle Eastern colleagues and students at Yale University

8    alleging racial discrimination for his abrupt job termination, could very well affect the sentiments

9    of the large Middle Eastern students and faculty at the Yale campus who are ardent supporters of

10   Dr. Qumsiyeh's pro-Palestinian and anti-Israeli- high gear political activism, and this in-turn

11   could affect Yale University's  close financial and educational ties in the Middle East, as only

12   partially referenced below:

13        **Big donations to American colleges from the Muslim world ...**
14   *creepingsharia.wordpress.com/.../big-**donations**-to-american-colleges-fro...*;    May  18,
15   2011 - **Yale University** received $500,000 from Bahrain this January and Stanford
16   University received a $149,97 0 **gift** from **Saudi** Arabia. Universities **...** ; **Schools accept**
17   **prince's money | Yale Daily News** *yaledailynews.com/blog/2006/01/09/schools-accept-*
18   *princes-money/* Jan 9, 2006 - **Yale** was passed over last month when controversial **Saudi**
19   Prince Alwaleed **...** The **donations** have been accepted by both **universities**, but the **...** ;
20   **Yale Selects Daughter of Global Muslim Brotherhood Leader as ...** *www.campus-*
21   *watch.org/article/id/8144*  Aug 24, 2009 - **Yale University President** Richard C. Levin,
22   said it is extremely useful **...** Participants from **Saudi Arabia**, Turkey, India, China and
23   Russia, will be **...** ; *Yale* **Selects Daughter of Global Muslim Brotherhood Leader as**
24   **...** *www.campus-watch.org/article/id/8144* ;  Aug 24, 2009 - According to the report:
25   *Yale University* selected Muna Abu Sulayman, **...** *Yale University* President Richard C.
26   *Levin*, said it is extremely useful to have **...** Participants from Saudi *Arabia*, Turkey,
27   India, China and Russia, will be **...** ;  **Archived-Articles: Why Did** *Yale* **Censor the**
28   **Danish                                                                          Cartoons?**
29   *www.americanthinker.com/2009/.../why_did_yale_censor_the_danish.ht...* Sep 15, 2009 -
30   *Yale University*, through the Office of the President, Richard *Levin,* freely admitted that
31   she had frequented Saudi *Arabia*…

32

1        Given the above undesirable consequential circumstances at the time of plaintiff's

2 departure from YSM after completing his lucrative professional ABMG- clinical cytogenetic

3 training there, and given plaintiff's refusal in his written report (Exhibit # 3) to serve as a witness

4 against Dr. Qumsiyeh, and also due to plaintiff refusal to assume a position at YSM replacing

5 Dr. Qumsiyeh so that plaintiff could be compelled Dr. Lifton / YSM to testify against Dr.

6 Qumsiyeh, plaintiff's  professional clinical cytogenetics employment opportunities that plaintiff

7 initially had  at defendant, Dr. Morton's diagnostic cytogenetics laboratory at BWH / HMS as

8 well as numerous subsequent job applications by plaintiff at defendant, Dr. Morton's  clinical

9 cytogenetics laboratory as well as medical genetics research job opportunities and professional

10 ABMG molecular genetics training opportunities at HMS (and around the nation as well) were

11 recklessly intentionally discriminated and retaliated against by defendant, Dr. Morton, as

12 continuing acts of conspiratorial violations in collusion with Dr. Lifton and Dr. Pober.

13        Whenever plaintiff approached Dr. Morton (defendant), she would coercively advise

14 plaintiff to seek a position at YSM instead, as one of her email directly alludes to (*Exhibit # 4*).

15 Dr. Morton specifically refused to release the Federal Government (NIH) research grant money

16 that was to be shared with Dr. Richard Maas (BWH), in order to prevent Dr. Maas from hiring

17 plaintiff for his DGAP- research projects, as the email(s) indicate (Exhibit # 5).

18        Although Dr. Maas tried his best to get his share of the common research Federal Grant

19 that was controlled by Dr. Morton as co-investigator of the DGAP- research project,  she

20 repeatedly refused to release the portion of the funds that belonged to Dr. Maas, per NIH-grant

21 distribution guidelines.  This situation was clearly conveyed to Plaintiff by Dr. Maas, and it has

22 been indicated in plaintiff's SOS emails to defendant, Dr. Morton, and responded by her in one

23 of her email response to Dr. Rafi *(Exhibit # 5)*.

Furthermore, Dr. Morton refused to consider plaintiff's additional ABMG- Molecular Genetic training candidacies despite plaintiff being an internal candidate applying from within HMS, while serving at the General Clinical Research Core (GCRC) laboratory at the Children's Hospital Boston, which is integral part of HMS. The ABMG-training program at HMS has been continuously funded by the Federal Grant money (NIH- Medical Genetics training grants to defendant, Dr. Morton (See, NIH Research Portfolio Online Reporting Tools (RePORT): https://report.nih.gov/).

When plaintiff, Dr. Rafi consulted with defendant's superior official at BWH / HMS, the Scientific Director for Harvard Partners Center for Genetics and Genomics (HPCGG), after making appointments to see him (*Exhibit # 6*), plaintiff was advised by the HPCGC- Scientific Director that it was consequent to Dr. Lifton and Dr. Pober's conspiratorial influence peddling that Dr. Morton was unwilling to consider any of the plaintiff's applications.

Therefore, exclusively due to the above <u>confirmed</u> conspiratorial ceaseless and reckless intentional retaliatory job discrimination that was perpetuated by defendant, Dr. Morton  at HMS plaintiff's professional Clinical Cytogenetics career was <u>totally lost to this day</u>.

In accordance with **the enforcement Clause of the Section 5 of   Fourteenth Amendment, Congress has provided a remedy for conduct by private parties** (*viz. defendant, Dr. Morton*) **which deprives citizens of Fourteenth Amendment rights.**

It seems that in exercising **the enforcement powers provided under the section 5,** ***"Congress was not limited to remedying inequalities which the courts would determine to be violative of the Constitution, and it may prohibit conduct which would not otherwise be unlawful in order to secure the guarantees of the Fourteenth Amendment"***. See, *United States v. Archibald Cox, The Supreme Court, 1965 Term—Foreword: Constitutional Adjudication and*

1   *the Promotion of Human Rights,* 80 Harv. Law Rev., 91, 98, 107 (1966): **"A chief responsibility**

2   **of Counsel in Constitutional litigation is to aid the Court in that mysterious process by which**

3   **decisions meet new needs, yet are shown to have the legal roots needed to maintain the rule of**

4   **law".**

5       The legislative history of **section 1985(3)** supports the notion not only that conspiracies

6   by private individuals (*viz. defendant*) to deprive citizens of the fourteenth amendment right to

7   equal protection of the laws were conceptually possible but also that the statute was enacted to

8   protect citizens against precisely such a deprivation.

9       **42 U.S.C. § 1985(3)** provides citizens with a cause of action against private conspiracies

10   to violate constitutional rights and civil rights. The Act permits an aggrieved citizen to sue

11   private individuals (*viz. defendant*) who have conspired to deprive the citizen *(viz. plaintiff)* of

12   constitutional rights.

13       **Supreme Court also now construes Section 1985(3) to cover private conduct** (See,

14   *Griffin v. Breckenridge,* 403 U.S. 88 (1971)) such as the one that is alleged in this complaint,

15   wherein, defendant is alleged to have violated plaintiff's constitutional provisions. (Also  see,

16   *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 274 (1993); *Griffin v. Breckenridge,*

17   403 U.S. at 104-06).  It should be noted that **the United States Supreme Court held in** *Griffin*

18   *v. Breckenridge,* 403 U.S. 88, 91 S. Ct. 1790, 29 L.Ed.2d 338 (1971)) **that no showing of state**

19   **action is required in order to sue under section 1985(3).**

20       **In accordance with the requirements under 42 U.S.C. § 1985(3), this complaint alleges:**

21       (1) A conspiracy;
22       (2) To deprive plaintiff of equal protection, equal privileges, and immunities;
23       (3) An act in furtherance of the conspiracy; and

1     (4) An injury or deprivation resulting therefrom (See, *Tilton v. Richardson*, 6 F.3d

2         683, 686 (10th Cir. 1993).

3

4     Accordingly, this complaint indicates an agreement and concerted action as well as the

5  existence of a discriminatory motive by defendant, Dr. Morton to ceaselessly and recklessly

6  deprive plaintiff of equal protection, equal privileges, and immunities (See, *Babbar v. Ebadi*,

7  2000 U.S. App. LEXIS 11798 (10th Cir. 2000).

8     **It should also be noted that plaintiff, Dr. Rafi in this complaint furnishes a genuine**

9  **factual basis to support the existence of the defining elements of the conspiracy agreement**

10  **and concerted action** (See, *Crabtree v. Muchmore*, 904 F.2d 1475, 1476 (10th Cir. 1990)).

11     **With respect to the alleged ceaseless and reckless retaliatory discriminatory motive,**

12  **plaintiff additionally asserts some class-based and/or some racially discriminatory motive**

13  **lurking behind the reckless and ceaseless conspiratorial activities.**

14     More specifically, defendant, Dr. Morton (*majority race- White-Caucasian-female,*

15  *majority Christian faith*) is alleged to have abused her personal influence in the field of medical

16  genetics at HMS and elsewhere in order to violate plaintiff, Dr. Rafi's *(who is a person of color,*

17  *racial minority, East Indian/Asian male; and of minority Islamic faith)* civil rights as well as

18  constitutional rights (which has resulted in irreversible losses to plaintiff's high-paying

19  professional clinical cytogenetics career which has profoundly affected his personal life), in

20  conspiratorial collusion with Dr. Lifton, who was Dr. Morton's former medical genetics

21  colleague while he was working at Brigham and Women's Hospital (HMS) prior to his assuming

22  the chairmanship of the genetics department at YSM.  **Moreover, defendant, Dr. Morton as**

23  **well as Dr. Lifton belong to the same majority** *Caucasian white race, and of same majority*

24  *Christian faith..*

1    Additionally, defendant, Dr. Morton, in her personal and professional capacities, is also

2    alleged to have conspired with Dr. Barbara Pober (*majority race- Caucasian white female,*

3    *influential Jewish faith)-* who was desperately seeking to be re-hired by Dr. Lifton (YSM).  Dr.

4    Lifton (YSM) sought to  safe-guard against a probable legal challenge from Dr. Qumsiyeh

5    (*person of color, male, Palestinian Arab- Middle Eastern- minority race*) to Dr. Pober's re-

6    hiring at YSM.

7    Understandably, Dr. Lifton had only tentatively terminated  Dr. Pober's  position at the

8    Genetics Department at YSM in order to deny Dr. Qumsiyeh (**person of color, male,**

9    **Palestinian Arab- Middle Eastern- minority race**), a *prima facie* case of retaliation for having

10   exercised his First Amendment right of free speech for having spoken against Israel in his

11   passionate devotion to pro-Palestinian and anti-Israeli political activism.  In fact, *Dr. Qumsiyeh*

12   *had fore-warned authorities at YSM- via an email circular warning against terminating his*

13   *position under any pretext*, prior to the abrupt termination of his associate professor- faculty

14   position as well as  his directorship of the clinical cytogenetic diagnostic laboratory at the

15   Genetics Department by Dr. Lifton (YSM).

16   Thus, in order to exclusively ward off any legal action against Dr. Lifton as well as

17   against YSM  by the dismissed disgruntled Arab-Palestinian minority, colored faculty member

18   with significant support of the Middle Eastern faculty and students at the Yale campus and

19   around the nation (Dr. Qumsiyeh), Dr. Lifton and YSM  chose to simultaneously (*but only*

20   *tentatively!*) terminate the position of an influential Jewish- majority Caucasian- race female

21   faculty member (Dr. Pober) as well at the genetics department, despite the fact that Dr. Pober's

22   pediatric medical genetic service was warranted at YSM, and her husband being  a senior and

23   influential tenured professor, Director, and Vice-Chair at YSM.

1    Therefore, Dr. Pober assumed only a tentative research faculty position at the Children's

2    Hospital Boston (CHB) at Harvard Medical School (understandably, pre-arranged by Dr. Lifton

3    and YSM so that  she could be hired back at YSM at the earliest opportunity to do so, in

4    accordance with the alleged stealth conspiratorial agreement between Dr. Lifton (YSM)  and Dr.

5    Pober.

6    I hindsight, it is crystal clear that Dr. Lifton (YSM)  allegedly had planned to hire back

7    Dr. Pober after a while **availing plaintiff, Dr. Rafi as a befitting minority race- colored**

8    **individual- witness against Dr. Qumsiyeh,** since Dr. Rafi had worked under Dr. Qumsiyeh and

9    more importantly, and had written confidential complaint against Dr. Qumsiyeh <u>at the behest of</u>

10   <u>Dr. Lifton</u> *(but stressing therein that he could not be utilized as a witness against Dr. Qumsiyeh*

11   *(Exhibit #3),* and therefore, did not want to take up a position at Dr. Lifton's  genetics department

12   after the completion of his professional clinical cytogenetics board (American Board of Medical

13   Genetics; ABMG) training there, to avoid being compelled by Dr.  Lifton to serve as a witness

14   against Dr. Qumsiyeh.

15   Moreover, after the completion of the ABMG- professional clinical cytogenetics training

16   at YSM at the Genetics Department, plaintiff had been positively interviewed at Harvard

17   Medical School for a professional clinical cytogenetics position by defendant, Dr. Morton, and

18   plaintiff very much wanted to take up a position in Boston, as the email evidencing would attest

19   to *(Exhibit # 4).*

20   <u>Exclusively consequent to the alleged conspiracy,</u> plaintiff's high paying clinical

21   cytogenetics career as well as his medical genetics academic career came to a halt, since

22   defendant, Dr. Morton subsequently refused to consider more than 3 dozen clinical cytogenetics

1

2    job applications at her ever-expanding diagnostic cytogenetics laboratory, and plaintiff's

3    professional clinical cytogenetics job applications around the nation as well which were never

4    considered "as a domino-effect" due to the alleged conspiracy, collusion, coercion, and

5    retribution against plaintiff by defendant, Dr. Morton, thus coercing plaintiff, Dr. Rafi's to take

6    up a position at YSM instead to facilitate the return of Dr. Pober_(Exhibits # 4 & 5).

7        All of the alleged conspiracies, and the ensuing coercion, ceaseless and reckless reprisals

8    against a lower class, minority sect individual, Dr. Rafi *(non-white, colored- minority race (East*

9    *Indian) and minority- Islamic faith)* by defendant, Dr. Morton *(who belongs to majority*

10    *class/race and religion),* and the stealth job termination of a minority sect *(Arab- Middle*

11    *Eastern- colored race)* faculty member (Dr. Qumsiyeh) by Dr. Lifton *(who belongs to majority*

12    *white race / class and religion*), and the consequent stealth conspiratorial joint effort to rehire Dr.

13    Pober *(a Caucasian- White- majority sect- Jewish faculty member)*-- **all collectively constitutes**

14    **as the genuine issue of material fact as to class-based and racially discriminatory motives**

15    **of defendant, Dr. Morton in conspiratorial collusion with Dr. Lifton, underlies defendant,**

16    **Dr. Morton's alleged ceaseless and reckless intentional discriminatory acts in this**

17    **complaint against plaintiff, Dr. Rafi by defendant, Dr. Morton in her personal capacity as**

18    **well as in her professional capacity, under 42 U.S.C. § 1985(3):** See, *Tilton v. Richardson*, 6

19    F.3d 686 (1993); *Kush v. Rutledge*, 460 U.S. 719, 725-26, 75 L. Ed. 2d 413, 103 S. Ct. 1483

20    (1983).

21

22

III.    **CAUSE OF ACTION UNDER 42 U.S.C § 1986:**

*IT IS UNLAWFUL TO NEGLECT OR REFUSE TO PREVENT CONSPIRACY TO*
*INTERFERE WITH CIVIL RIGHTS AND CONSTITUTIONAL RIGHTS*

Unlike **42 U.S.C. § 1985(3)** above, **42 U.S.C. § 1986 creates a legal duty for defendant, Dr. Morton to have effectively interjected to rectify the continuing detrimental repercussions of the alleged illegal conspiratorial coercive and retaliatory job discriminations that were in fact initiated and perpetuated by defendant, Dr. Moron in collusion with Dr. Lifton, which had crippled plaintiff, Dr. Rafi's professional clinical cytogenetics career and also his medical genetics research career.**

Plaintiff desperately pleaded repeatedly seeking consideration of his candidacies by defendant, Dr. Morton hoping to put an end to the continuing coercive and retaliatory job discriminations by her, **since she was well-poised to do so, but she firmly refused to yield** *(Exhibits # 4 & 5).*

In this complaint, plaintiff, Dr. Rafi upon establishing an underlying conspiracy claim under **§ 1985(3)** above *(under Cause of Action # II)*, herein extends the reach of the liability with § 1986, **since § 1986 reaches more broadly than § 1985, its predicate, by inculpating even bystander defendants, even if they are not themselves the conspirators under § 1985(3).**

Thus, **42 U.S.C. § 1986** is unique among American civil rights statutes in creating liability even when a defendant has neither personally committed a discriminatory act, nor engaged in a conspiracy to do so, nor acted with discriminatory intent. **Even a negligent failure to protect by an actor with knowledge of a Section 1985 conspiracy and power to protect its victims is actionable** (See *Clark v. Clabaugh,* 20 F.3d 1290, 1298 (3d Cir. 1994). Further, **"a**

1  plaintiff need not prove that a Section 1986 defendant had the discriminatory intent

2  requirement of Section 1985" (See *Clark v. Clabaugh,* 20 F.3d 1290, 1293-94, 1298 (3d Cir.

3  1994)), <u>rather, the plaintiff need only demonstrate:</u>

4      (1) The defendant had actual knowledge of the Section 1985 conspiracy;

5      (2) The defendant had the power to prevent or aid in preventing the commission of the

6          Section 1985 violation;

7      (3) The defendant neglected or refused to prevent the § 1985 conspiracy; and

8      (4) A wrongful act was committed by the conspirators. (See, *Clark v. Clabaugh,* 20 F.3d

9          1290, 1295 (3d Cir. 1994); also see, Chester J. Anteau & Gary E. Bair, Federal Civil

10         Rights Acts: Civil Procedure § 281 (2d ed. 1980 & Supp.1995).

11

12     **Even knowledge of rumors may satisfy the above first element** (See, *Clark,* 20 F.3d at

13  1296-97). **The defendant is liable for all damages that he or she could have prevented with**

14  **reasonable diligence** (See, *Clark,* 20 F.3d at 1298).

15     While Section 1985 defendant must be a conspirator and must have joined in the illegal

16  conspiracy by at least manifesting his or her agreement with the conspiratorial plan, <u>evidence of</u>

17  <u>mere encouragement of the conspiracy rather than direct participation may suffice to establish</u>

18  <u>coconspirator liability under this Section § 1986), and this Section requires no such direct</u>

19  <u>connection to the conspiratorial agreement. In fact, it attaches liability for culpable inaction</u>. **It**

20  **renders responsible those whose knowledge places them closest to the underlying**

21  **conspiracy, regardless of whether or not they acted affirmatively.**

22     **More importantly, individuals in their personal capacity can legitimately and**

23  **constitutionally be named as defendants under this Section §1986, and under a broader**

24  **interpretation of the Fourteenth Amendment.**

IV.    <u>CAUSE OF ACTION UNDER 42 U.S.C. § 1981a:</u>

*DAMAGES IN CASES OF INTENTIONAL DISCRIMINATION IN EMPLOYMENT*

In *Cannon v. University of Chicago*, 441 U.S+. 677 (1979), by analogy, the Court holds that **Title VI** <u>provides a cause of action for retaliation and that plaintiff can bring this cause of action even though he was not the subject of the discrimination complaint.</u>  This interpretation is supported by the Fourth Circuit Court of Appeals' decision in *Peters v. Jenney*, 327 F.3d 307, 318 (4 Cir. 2003), which held that **Title VI** <u>contains an "implicit prohibition on retaliation for opposing practices that one reasonably believes are made unlawful by § 601 [Title VI]."  The Fourth Circuit also held that this private right of action was available to the plaintiff regardless of whether the plaintiff was a member of the protected class.</u> (*Id*).

<u>Furthermore, plaintiff does not have to prove that the conditions against which he protested actually amounted to a violation of § 1981</u>.  See, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002):

> *"A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful, so long as he can establish that he possessed some good faith, reasonable belief that the underlying challenged actions of the employer violated the law"* (*internal citations omitted*); also See, *Turner*, 181 F. Supp.2d at 134; *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

**Section 1981, in pertinent part, states that** *"[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."*

1    In *CBOCS West Inc. v. Humphries*, 128 S. Ct. 1951 (2008), **the Supreme Court also**

2    **concluded that** *"this provision encompasses a complaint of retaliation against a person who*

3    *has complained about a violation of another person's contract related right."*

4

5    **V.    CAUSE OF ACTION UNDER 42 U.S.C. § 2000d-4a]:**
6
7    ***TITLE VI OF THE CIVIL RIGHTS ACT OF 1964-AS AMENDED***
8
9    At the outset, it should be noted that defendant, Dr. Morton is a continuous recipient of

10   federal government research grants money through the National Institutes of Health (*NIH; a*

11   *federal government agency of the US Department of Health & Human Services)* worth millions

12   of dollars as the "principal investigator" at BWH/HMS, encompassing the time period of the

13   alleged conspiracy, collusion, ceaseless and reckless retaliation and retribution, as alleged in this

14   complaint (See, NIH Research Portfolio Online Reporting Tools (RePORT):

15   https://report.nih.gov/).

16   **The enactment of the Civil Rights Restoration Act, which amended Title VI actually**

17   **NOW covers the "Entire Entity": including the individual principal investigators** (viz.

18   defendant, Dr. Morton) **within a department of a University who apply, receive, and utilize**

19   **Federal Government research grant money**.:

20   Under this Civil Rights Act Amendments [**42 U.S.C. § 2000d-4a**]: **Title VI of the Civil**

21   **Rights Act of 1964- as amended,** adds at the end the following **New Section: § 606:**

22   **For the purposes of this title, the term** *'program and activity'* **and the term**
23   *'program'* **means all of the operations of:**
24
25       (1)(A) A department, agency, special purpose district, or other
26           instrumentality of a State or of a local government, or
27       (2)(A) A college, university, or other postsecondary institution, or a public
28           system of higher education, or

24

1          (3)(A) An entire corporation, partnership, or other private organization, or
2                    an entire sole proprietorship---
3                    (i) if assistance is extended to such corporation, partnership,
4                    private organization, or sole proprietorship as a whole, or and
5                    recreation; or
6                    (ii) which is principally engaged in the business of providing
7                    education, health care, housing, social services, or parks and
8                    recreation, or
9        (4)     Any other entity which is established by two or more of the entities
10                described in paragraphs (1), (2), or (3); **any part of which is**
11                **extended Federal financial assistance."***(emphasis added)*.
12

13        To further substantiate the culpability of federal government research and training funds

14    receiving principal investigators, such as Dr. Morton *(defendant)*, in a recent case involving

15    abuse of federal government research grants at the Northwestern University by a federal grants

16    utilizing principal investigator- scientist, Dr. Bennett (See, *United States, et al., ex rel. Melissa*

17    *Theis v. Northwestern University, Dr. Charles L. Bennett, et al.*, No. 09 C 1943 (N.D. Ill.,

18    2009)), it is alleged that Dr. Bennett, defendant in that case <u>as the principal investigator,</u> directed

19    and authorized the spending of NIH research grant funds on goods and services that did not meet

20    applicable NIH and government grant guidelines.

21        `These allegations were also investigated by the U.S. Department of Health and Human

22    Services Office of Inspector General, the Federal Bureau of Investigation, the National Institutes

23    of Health (NIH), and the U.S. Attorney's Office.  The government contended that it had certain

24    civil claims against the principal investigator and Northwestern University.

25        Although Northwestern University settled the case by paying millions of dollars, the

26    federal government (the US Department of Justice) additionally <u>directly pursued the case against</u>

27    <u>the principal investigator</u> (Dr. Bennett), and reached a settlement agreement: See,

28    http://www.justice.gov/sites/default/files/usao-ndil/legacy/2015/06/11/pr1030_01a_0.pdf;   and

1    https://www.justice.gov/usao-ndil/pr/former-northwestern-physician-pay-united-states-475000-

2    settle-cancer-research.

3    <u>Accordingly</u>, herein, plaintiff, Dr. Rafi's complaint also alleges that defendant, Dr.

4    Morton, being a continuous recipient of federal government research grants money from NIH at

5    BWH/HMS, is alleged to have illegally conspired with other federal government research grants

6    money utilizing principal investigators at BWH/HMS (*such as Dr. Maas, Dr. Pober, Dr. Irons,*

7    *and also at YSM with Dr. Lifton),* "<u>in her personal capacity as well as in her professional</u>

8    <u>capacity"</u> to coerce and to retaliated against Dr. Rafi's medical genetics research job

9    opportunities at HMS as a whole-- **as acts of conspiratorial retribution, and thus ceaselessly**

10    **violated plaintiff's Civil Rights as well as the Constitutional rights-- consequent to the**

11    **enactment of the Civil Rights Restoration Act, which amended Title VI to cover the "Entire**

12    **Entity", and therefore, encompassing individual principal investigators who receive and**

13    **utilize federal government's research grant money.**

14

15    **VI.    <u>CAUSE OF ACTION UNDER SPENDING CLAUSE 1:</u>**

16

17    ***ARTICLE I, SECTION 8 OF THE U.S. CONSTITUTION***

18

19    Moreover, the Spending Clause 1 (*Article I, Section 8*) of the U.S. Constitution which

20    has been widely recognized as providing the Federal government with the legal authority to offer

21    federal government grant funds to states and localities that <u>"are contingent on the recipients</u>

22    <u>refraining from violating the Civil Rights as well as the Constitutional rights".</u>

23    The Supreme Court in its 1987 decision in *South Dakota v. Dole* 483 U.S. 203, 205-08

24    (1987) (quoting *Pennhurst State Sch. & Hosp.,* 451 U.S. at 17), held that legislation enacted

25    pursuant to this Spending Clause must be in pursuit of the "general welfare", and that <u>any</u>

26

1  conditions attached to the receipt of federal funds must NOT violate various Civil Rights as well

2  as provisions of the Constitution, such as the first amendment or the due process clause of the

3  fifth as well as the fourteenth amendments **which prohibit depriving life and liberty.**

4      (See, **The Federal Government's Authority to Impose Conditions on Grant**
5        **Funds,** Brian T. Yeh, Legislative Attorney, March 23, 2017, Congressional
6        Research Service 7-5700; www.crs.gov R44797:
7        https://fas.org/sgp/crs/misc/R44797.pdf.).

8
9  **VII.**    **CAUSE OF ACTION UNDER 42 U.S.C. § 1983:**
10
11          *PLAINTIFFS COULD SUE UNDER § 1983 TO ENFORCE THE SAME*
12          *TITLE VI REGULATIONS.*
13

14      The alleged conspiracy and the consequent on-going coercion, intentional discriminatory

15  and retaliatory violations and reprisals by federal government funds recipient- principal

16  investigator *(viz. defendant, Dr. Morton)*-- **is actionable as such under Title VI, which in-turn**

17  **is  actionable under 42 U.S.C. §  1983-- for the federal government funds recipient-**

18  **principal investigator, Dr. Morton's (defendant) violation of  plaintiff, Dr. Rafi's**

19  **Constitutional Provisions, such as the First Amendment OR the Due Process OR Takings**

20  **Clauses of the Fifth  and Fourteenth Amendments.**

21      In *Powell v. Ridge (*189 F.3d 403 (3d Cir. 1999) the third Circuit concluded that *"the*

22  *plaintiffs could sue under § 1983 to enforce the same Title VI regulations, since  Section 1983 is*

23  *a powerful tool <u>for vindicating both constitutional and federal statutory rights</u>, including*

24  *regulations such as those issued pursuant to section 602 that "flesh out" existing statutory rights.*

25  *<u>In light of Title VI's limited explicit remedies, there is no basis to find that the statute precludes</u>*

26  *<u>§1983 claims".</u> (emphasis added).*

27      **In fact, Title VI plaintiffs should be able to use § 1983 suits to raise Constitutional**

28  **claims and sue officials (viz. defendant, Dr. Morton), in their individual capacities as well,**

1    **because Title VI itself does not provide such remedies, and § 1983 creates a remedy when**

2    **rights are violated.**

3          (See,     **Using § 1983 to Enforce Title VI's Section 602 Regulations.**
4                    Bradford C. Mank. *Kansas Law Review, Vol. 49, p. 321, 2001;*
5                    *U of Cincinnati Public Law Research Paper No. 10-21,* Last revised:
6                    27 Apr 2010; https://scholarship.law.uc.edu/cgi/viewcontent.
7                    cgi?article=1265&context=fac_pubs).

8

9

10       Defendant, Dr. Morton's extensively authenticated receipt and utilization of federal

11    government funds each year, and the fact that **the Civil Rights Act Amendments [42 U.S.C. §**

12    **2000d-4a, Title VI of the Civil Rights Act of 1964,** *__as amended__,* now covers the entire entity,

13    not excluding individual principal investigators-- **entitles Dr. Rafi to pursue charges against**

14    **Dr. Morton under 42 U.S.C § 1983, without the requirement of either the defendant, Dr.**

15    **Morton or BWH/HMS being "state actors"** *per se.*

16

17    **VIII.**     **CAUSES OF ACTION UNDER 42 U.S.C.§ 1983:**

18

19                *"STATE ACTOR"- STATUS CLAIM FOR DEFENDANT AND HARVARD*
20                *UNIVERSITY*

21

22                      *"IF GOVERNMENT REQUIRES OR INDUCES A PRIVATE PARTY TO*
23                      *ENGAGE IN LAW ENFORCEMENT, ALL RELEVANT*
24                      *CONSTITUTIONAL RESTRAINTS APPLY".*

25

26       Additionally, plaintiff claims that defendant, Dr. Morton and Harvard University should

27    be construed as "State Actors" for the purpose of § 1983 claims given the augmenting legal

28    theory that has been advanced by Professor, Jed Rubenfeld (*a leading scholar of Constitutional*

29    *law, privacy, the First Amendment, and criminal law*) which has been laid out in his peer-

30    reviewed published article: *Yale Law School, Public Law Research Paper No.*

1    *588: "Privatization, State Action, and Title IX: Do Campus Sexual Assault Hearings Violate Due*

2    *Process?"* ([http://texaslawreview.org/wp-content/uploads/2017/11/Rubenfeld.pdf](http://texaslawreview.org/wp-content/uploads/2017/11/Rubenfeld.pdf)):

3            Under "State Action" doctrine properly understood, argues Rubenfeld, **"If**

4    **government requires or induces a private party to engage in law enforcement, all**

5    **relevant constitutional restraints apply."** This is exactly what the Obama

6    administration Department of Education did in April 2011 when it instructed universities,

7    <u>on pain of losing federal funding,</u> to investigate, adjudicate, and punish all allegations of

8    sexual assault. That is, although the government also demanded that universities shrink

9    due process protections for the accused, by deputizing them to engage in law enforcement

10    in addressing allegations of sexual misconduct, <u>the administration in effect imposed on</u>

11    <u>them an obligation to comply with constitutional guarantees of due process and equal</u>

12    <u>protection.</u> *(emphasis added)*.

14    (See,    Rubenfeld, Jed, ***Privatization, State Action, and Title IX: Do Campus Sexual***
15                 ***Assault Hearings Violate Due Process?*** (October 21, 2016).
16                 Yale Law School, Public Law Research Paper No. 588.
17                 Available at  SSRN: https://ssrn.com/abstract=2857153
18                 or http://dx.doi.org/10.2139/ssrn.2857153.
19                 *(Exhibit # 7, herein)*.

22        "On April 4, 2011, the United States Department of Education's Office for Civil Rights

23    (OCR) sent a nineteen-page letter to American colleges and universities. Opening with the

24    government-standard but peculiar salutation, "Dear Colleague"—as if the sender were a fellow

25    academic, or, since that was not so, as if academics were fellow federal administrative agents—"

26    (*Id.* at page 20, paragraph 3; *emphasis added*).

27        'What government cannot itself do without violating constitutional rights, it cannot

28    induce private individuals to do. And whenever the federal government privatizes its law

29    enforcement powers, constitutional restraints apply in full. They apply, that is, not only to

1    specifically mandated acts, but to the private parties' discharge of these powers in their entirety".

2    (*Id*. at page 69, paragraph 1).

3    IX.    <u>CAUSE OF ACTION UNDER 42 U.S.C. § 1983:</u>

5    *TO REINFORCE THE PROVISIONS OF THE FOURTEENTH AMENDMENT.*

7    **The primary objective of § 1983 is to provide a means for individuals and states to**

8    **reinforce in the federal or state courts the provisions of the Fourteenth Amendment as well**

9    **as all Constitutional Rights.**  The Supreme Court decisions in *Monroe v. Pape,* 365 U.S. 167,

10   81 S. Ct. 473, 5 L. Ed. 2d 492 (1961), and *Monell v. Department of Social Services*, 436 U.S.

11   658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) recognized the full scope of Congress's original

12   intent in enacting section 1983. The Supreme Court began accepting an expansive definition of

13   rights, privileges, or immunities and held that the act does cover the actions of state and

14   municipal officials, <u>even if they had no authority under state statute to act as they did in violating</u>

15   <u>someone's federal rights.</u>

16   Federal courts are authorized to hear cases brought under section 1983 pursuant to two

17   statutory provisions: 28 U.S.C.A. §1343(3) (1948) and 28 U.S.C.A. § 1331 (1948). Cases

18   brought under section 1983 may therefore be heard in federal courts by application of both of

19   these jurisdictional statutes:

20   *To prevail in a claim under section 1983, the plaintiff must prove two critical points:*

22   **(1) A person subjected the plaintiff to conduct that occurred <u>under a federal</u>**
23   **<u>law</u>** *(as has been presented under Causes of Action # V, VI, and VII, above),*
24   **or**
25   **<u>under color of state law</u>** *(as has been presented under Cause of Action # VIII*
26   *above);* **and**

28   **(2) This conduct deprived the plaintiff of rights, privileges, or immunities**
29   **guaranteed under federal law or the U.S. Constitution.**

1      Furthermore, all section 1983 claims shall be treated as tort claims for the recovery of

2   personal injuries (*Wilson v. Garcia,* 471 U.S. 261, 105 S. Ct. 1938, 85 L. Ed. 2d 254 [1985]).

3
## X.    IN CONCLUSION

5      Given the augmenting legal theory that has been advanced by none other than a leading

6   scholar of constitutional law, privacy, the First Amendment, and criminal law, arguing that the

7   Federal Government in effect having imposed on Universities, on pain of losing federal funding,

8   an obligation to comply with Constitutional guarantees of due process and equal protection

9   *(Cause of Action # VIII, above; Exhibit # 7)*; given the fact that the sum of federal government

10   grants given to defendant, Dr. Morton "as the principal investigator of several research projects

11   and ABMG- training grants at BWH/HMS, which amounts  to several millions of dollars from

12   the   National Institutes of Health (See, NIH Research Portfolio Online Reporting Tools

13   (RePORT): https://report.nih.gov/); given that due to the enactment of the **Civil Rights**

14   **Restoration Act** which amended Title VI now covers the entire entity, not excluding individual

15   principal investigators, such as defendant, Dr. Morton (Cause of Action # V, above); and  given

16   that under the **Spending Clause 1 of the US Constitution**, the conditions attached to the receipt

17   of federal government funds **must NOT violate various Civil Rights as well as provisions of**

18   **the Constitution, including the Fourteenth Amendment which prohibits depriving life and**

19   **liberty** (Cause of Action # VI, above)**:**

20      **Therefore, Title VI plaintiffs should also be able to use § 1983 to raise Constitutional**

21      **claims and sue officials "in their individual capacities as well as in their official**

22      **capacities", because Title VI itself does not provide such remedies, and 42 U.S.C. §**

23      **1983 creates a remedy when such rights are violated.**

# INJURY

1. The alleged reckless continuing violation of plaintiff's Civil Rights and Constitutional Rights since 2004 which has had the effect of: (1) destroying plaintiff's high-paying and in-demand professional clinical cytogenetics career, (2) crippling his medical genetics research career, and also (3) destroying his additional opportunities for professional ABMG-molecular genetic training.

2. The collective and coordinated alleged continuing conspiratorial coercive discriminatory violations by defendant, Dr. Morton in collusion with other faculty members at HMS as well as with Dr. Lifton at YSM has caused dire financial hardship to plaintiff over these years, which forced him to seek even labor oriented temporary jobs in order to survive.

3. This dire situation has caused irreversible damages to Dr. Rafi's personal life affecting his mental and psychological well-being.

4. Consequently, plaintiff being a naturalized US Citizen has felt a deep sense of loss of Civil Liberties and Constitutional Rights over these years which often caused depression and deep sense of loss of liberty.

## ENTITLEMENT FOR RELIEF

(a) Per EEOC, whenever discrimination is found, the goal of the law is to put the victim of discrimination in the same position (or nearly the same) that he or she would have been if the discrimination had never occurred, and the types of relief will depend upon the discriminatory action and the effect it had on the victim.

(b) Accordingly, plaintiff requests the Court / Jury to judge and grant appropriate amount of monetary compensation as a relief as well as to serve as deterrence given:

(1) The conspiratorial nature and the consequential reckless continuing misconduct in total disregard for plaintiff's Civil Rights as well as the Constitutional Rights for such a prolonged period of time, since 2004 to this date; and,

32

1          (2) The alleged misconduct's irreversible detrimental effects, as outlined under

2                the title "Injury" above.

3  **1.  <u>Equitable Relief:</u>**

4      Total compensation for lost wages to be reliably based on the following: The median total

5      annual compensation (salary) for North East region of US being $153,837, *per Graph*

6      *2.6: PhD Salaries by Years of Experience and Gender (Page 55), and per Table 2.7: PhD*

7      *Salaries by Region (Pages 55-56): American College of Medical Genetics and Genomics,*

8      *2011 Salary Survey Report, May 2012; (Exhibit # 8).*

9

10  **2.  Compensation for Future Losses to be reliably based on the following:**

11      Per Table 2.8: PhD Salaries by Region and Experience (pages 57-58), American College

12      of Medical Genetics and Genomics, 2011 Salary Survey Report, May 2012 (*(Exhibit # 8)*.

13

14  **3.  Compensation for emotional distress and suffering:** <u>to be determined by Jury.</u>

15

16  **4.  Punitive Damages given the continuing reckless indifference and malice, and as**

17      **deterrence:** <u>to be determined by Jury.</u>

18

19  **5.  Appropriate equitable relief against defendant as allowed by the Civil Rights Act of**

20      **1871, 42 U.S.C. § 1983:** including the enjoining, and permanent restraining of these

21      egregious violations in total disregard for plaintiff's Civil Rights as well as the

22      Constitutional Rights, and direction to defendants to take such affirmative actions as is

23      necessary to ensure that the effects of the unconstitutional and unlawful practices are

24      eliminated, and do not continue to affect plaintiff's or others' employment opportunities.

25  **6.  Attorney's fees and costs, if appointed or availed, pursuant to Civil Rights Act of**

26      **1871, 42 U.S.C. § 1988,** and

27  **7.  For such other and further relief to plaintiff may show himself justly entitled.**

28

1

## REQUEST FOR TRIAL BY JURY

Plaintiff requests trial by jury on all matters so triable.

## REQUEST FOR COURT APPOINTED *PRO BONO* ATTORNEY

Plaintiff being non-attorney *pro se*, requests legal guidance and assistance from Court appointed *pro bona* legal counsel in order to assist plaintiff with this complaint and the trial process, since plaintiff's earlier extensive attempts to bring on board an attorney to represent him were unsuccessful.

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares that he has read the above complaint, and that the information contained therein is true and correct to the best of his knowledge and understanding.


Respectfully submitted,                                    Date: February 25, 2018


_____

Syed K. Rafi, PhD.
*Pro se* Plaintiff
6166 Leesburg Pike
Apt. C-314
Falls Church, VA 22044.

34